[Cite as *In re B. Children*, 2021-Ohio-935.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE:  THE B. CHILDREN.  :  APPEAL NO. C-200419
  TRIAL NO.  F13-1795Z

  :

  :  *O P I N I O N.*

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  March 24, 2021

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Geoffrey W. Pittman*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Megan Busam*, Assistant Public Defender, Appellee Guardian ad Litem for the Children,

*Roger W. Kirk*, for Appellant Mother,

*James W. Costin*, Amicus Curiae, Guardian ad Litem for Mother.

**WINKLER, Judge.**

{¶1}    The mother of C.B., A.B., D.B.1 and D.B.2 appeals the judgment of the Hamilton County Juvenile Court granting permanent custody of her children to the Hamilton County Department of Job and Family Services ("HCJFS"). Mother challenges the grant of permanent custody on the ground that it was not in the children's best interest. Mother's guardian ad litem filed an amicus brief in support of mother's position. The children's longtime guardian ad litem and HCJFS argue that a grant of permanent custody was in the children's best interest, due to mother's failure to understand her need for the treatment of serious mental-health issues that will continue to interfere with her ability to provide an appropriate and safe home for the children. They request we affirm the juvenile court's judgment. After careful review of the record, we conclude that the evidence supported the juvenile court's decision, and we therefore affirm its judgment.

### Background Facts and Procedure

{¶2}    This immediate matter began in September 2017, when HCJFS filed a complaint for neglect and dependency involving all four children. The allegations of the 2017 complaint involved unsanitary home conditions, untreated mental-health issues, and abusive, threatening behavior by mother towards her children. This included asking them, "Who wants to die today." The agency had raised similar concerns about mother's mental health and abusive behavior on multiple occasions since 2013, resulting in the temporary removal of the children from mother's care.

{¶3}    On September 19, 2017, the court awarded the agency interim custody. The agency placed eight-year-old C.B. and seven-year-old A.B. with their maternal grandmother, six-year-old D.B.1 with a maternal cousin, and three-year-old D.B.2

2

with a maternal aunt. The court awarded the agency temporary custody of all four children in December 2017, after an adjudication of dependency. Mother was ordered to provide HCJFS and the children's guardian ad litem access to her home, complete mental-health assessments and follow any recommendations, participate in toxicology screenings, obtain and maintain sobriety, obtain and maintain stable income and housing, and successfully complete parenting classes.

{¶4} HCJFS offered mother reunification services and obtained an extension of temporary custody to enable reunification. On November 19, 2018, after the children had been in agency custody for the statutorily-defined-12-months-of-a-22-month period, and mother had not made sufficient progress, the agency moved to modify temporary custody to permanent custody, with a goal of adoption. The children's guardian ad litem filed a report and recommended the grant of permanent custody, noting, among other things, the instability caused by mother's reoccurring failures, and that the relative caregivers were licensed to adopt and desired to do so. The children, who expressed to their guardian ad litem an interest in returning to their mother and an interest in staying with their caregivers as a second choice, were appointed an attorney pursuant to *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110.

{¶5} Although a magistrate had begun a hearing on the permanent-custody motion, the subsequent unavailability of the magistrate resulted in a new hearing before a visiting judge. That two-day hearing began on January 31, 2020, was continued in progress, and concluded on September 9, 2020. The delay was necessitated by the Covid-19 pandemic.

3

{¶6} Before the start of the permanent-custody hearing, father executed a valid permanent surrender of his rights as parent, consistent with his lack of participation in any case plan or services.

{¶7} The evidence at the hearing on the motion for permanent custody showed that mother did not sufficiently comply with or complete the ordered services and failed to demonstrate any behavioral change suggesting the insight and stability required to warrant reunification with the children, who were doing well with their relative caregivers.

{¶8} Specifically, the evidence, including psychological evaluation reports, demonstrated that mother suffers from long-term mental-health issues that interfere with her functioning. One evaluator, Dr. Stephen Billman, who testified at the permanent-custody hearing, explained his diagnosis of "Unspecified Personality Disorder with Borderline, Narcissistic, and Antisocial Features" due to mother's issues with social functioning, manipulative behavior, mood changes, expressions of self-importance, and lengthy history of not cooperating with service providers and professionals. He had recommended that mother participate in psychotherapy, but admitted that she would be difficult to engage and treat due to her presenting with a high level of the disorder.

{¶9} Consistent with Dr. Billman's assessment, mother made little progress in understanding her need for continued intervention and treatment, despite the provision of services. Mother blamed her lack of progress in part on a poor relationship with her caseworker. But the evidence revealed mother caused the poor relationship, which made it impossible for the agency to confirm her housing situation and claims of at least five different employers over the relevant period.

Mother even bragged to Dr. Billman about her lack of cooperation, revealing she liked being hostile towards caseworkers "to see them fold."

{¶10} Although mother did participate in some counseling, she was not consistent and did not complete it. Importantly, she did not gain insight into her condition or credibly acknowledge her need for on-going therapy. Tellingly, when asked if the agency's concerns about her mental health were valid, she replied, "No."

{¶11} Mother completed parenting classes at Beech Acres, but ignored the program's request that she address her mental health before participating. She was further assigned a parenting coach, but this coach expressed serious concerns, including that mother failed to develop an understanding of the role she played in her children being in HCJFS custody and lacked appropriate decision-making skills. These concerns were on display at the hearing, as mother suggested that she was better equipped to determine the children's needs than a licensed professional, even though she was unaware of their needs due to lack of involvement.

{¶12} The ongoing HCJFS caseworker testified in January 2020 that mother and the children were bonded and mother regularly communicated with them on the phone. But mother was not seeing them in person every week despite open visitation, and the visitation never progressed beyond the supervised level due to mother's lack of progress. The caseworker testified that the children and relative caregivers were well-bonded, too. Further, she relayed that those relative caregivers are licensed to adopt, that she had explained to them the differences between legal custody and adoption, and that the agency's decision to request permanent custody is consistent with their desires. The caseworker repeated this testimony in September 2020.

{¶13} In addition, the caseworker testified that mother tested positive for drug use, engaged in repeated irresponsible behaviors such as driving without proper licensing, and had been repeatedly formally accused of violent criminal behavior involving a "significant other." Mother testified that she was willing to stop using marijuana, but she had not done so despite a court order issued almost three years prior. She also downplayed the significance of her legal difficulties and lacked any insight as to how they affect her ability to parent and provide a safe and stable home for her children.

{¶14} Upon the conclusion of the testimony, the parties submitted written closing arguments. Subsequently, the juvenile court granted HCJFS's motion and issued a decision explaining the judgment. Mother's sole assignment of error on appeal challenges the award of permanent custody on sufficiency- and weight-of-the-evidence grounds.

## Analysis

{¶15} In this case, before the juvenile court could grant the agency's motion for permanent custody, it was required to find by clear and convincing evidence that one of the factors in R.C. 2151.414(B)(1)(a)-(e) applied and that the grant of permanent custody was in the children's best interest. *See* R.C. 2151.414(B)(1). Mother concedes the state proved the 12-of-22-month factor of R.C. 2151.414(B)(1)(d). Mother contends, however, that the evidence did not support the juvenile court's best-interest finding. We disagree.

{¶16} In determining the children's best interest, the juvenile court was required to consider the factors delineated in R.C. 2151.414(D)(1)(a)-(e), as well as "all" other "relevant factors."

6

{¶17} As for the factor focusing on children's interaction and interrelationship with others, the juvenile court determined that the children had no bond with their father. Further, the court could not determine the strength of the bond with mother because her visitation had not progressed beyond supervised. The presence of relatives had always provided a level of safety to the children during the visits. Conversely, the court noted the children were bonded with each other, and it credited the relative caregivers for allowing the children to "nurture" that bond.

{¶18} As for the factor that requires consideration of the "wishes" of the children, the court found that the children at times had expressed their desire to be reunited with mother, but also had expressed a desire to remain with their current caregivers.

{¶19} As for the factor involving the children's immediate custodial history, the court noted that the children had been in the custody of HCJFS since September 2017, and placed with appropriate, nurturing relative caregivers.

{¶20} The final statutory factor of particular importance to the court's best-interest analysis is the one focusing on the children's need for a legally secure permanent placement and whether that type of placement could be achieved without a grant of permanent custody to the agency. The court cited compelling reasons weighing for permanent custody to the agency.

{¶21} First, the court found that the agency had made reasonable efforts for reunification and the children could not be returned to either parent within a reasonable time. Specifically, with respect to mother, the court found mother had been offered a multitude of services that she reluctantly began and ultimately refused based on her "resolute belief" that she was not in need of such services. Based on the evidence, including mother's testimony and medical reports, the court noted that

"perhaps due to the severity of her mental health issues, [mother] cannot reasonably be expected to engage in the kind of long term treatment necessary to stabilize her to the point of being able to provide a consistent safe and nurturing environment to the children."

{¶22} While mother testified that the agency's concerns about her mental health were invalid, she also claimed that she had been prevented from completing some provided services because of the restrictions arising because of the Covid-19 pandemic. The court found the explanation unpersuasive based on the evidence, which showed "the long pattern of non-cooperation with services which pre-dates the onset of the [2020 pandemic] limitations." The court's reasoning is amply supported by the record.

{¶23} Finally the court noted the current plan for the children was adoption by their relative caregivers. Mother does not dispute this fact, but contends the relative caregivers could serve as the children's legal custodians without the very permanent termination of her parental rights. At this stage of the proceedings, however, a reunification with mother was not the "paramount concern." *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 65. The court considered mother's position, but rejected it as the caregivers had not petitioned for legal custody and, regardless, considering all the circumstances, permanent custody was more "appropriate and in line with the children's best interest." Notably, the agency had been involved with the family since 2013, and the children's longtime guardian ad litem recommended permanent custody to HCJFS as in the children's best interest.

## Conclusion

**{¶24}** The juvenile court ultimately found in light of all the evidence that an award of permanent custody to HCJFS was in the children's best interest. In arriving at the conclusion, the juvenile court applied the relevant statutory factors and made factual findings that were based upon clear and convincing evidence. *See In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15. This is not a case where the juvenile court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of the children to be placed in the permanent custody of HCJFS. *See id.* at ¶ 16. Because the statutory factors were met, we hold the juvenile court did not err in granting permanent custody to HCJFS. Accordingly, we overrule the assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**BERGERON, P.J.**, and **BOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.